UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ISRAEL RAMIREZ LUNA,<br><br>        Petitioner,<br><br>   v.<br><br>DONALD O'KEEFE,<br><br>        Respondent. | Case No. 17-CV-02129-LHK<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Re: Dkt. No. 1 |

Petitioner Israel Ramirez Luna ("Petitioner"), a naturalized citizen of the United States who is awaiting extradition to Mexico, filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241. ECF No. 1 ("Pet."). In his petition, Petitioner argues that the Magistrate Judge's decision to certify Petitioner's extradition was erroneous because (1) Petitioner's extradition "is time-barred under the applicable treaty"; and (2) "the government failed to satisfy its burden of establishing probable cause to believe that [Petitioner] committed the offense for which extradition is sought." *Id.* at 1. The government has filed an opposition to the petition. ECF No. 4 ("Opp."). Having considered the submissions of the parties, the relevant law, and the record in this case, the Court hereby DENIES the petition.

## I.      BACKGROUND

**A. Factual Background**

Petitioner became a naturalized United States citizen in 2001, *In re Extradition of Luna*, No. 16-xr-90095 NC (N.D. Cal.), ECF No. 1 ¶ 13,[1] but he is originally from Salvatierra, Guanajuato, Mexico. *See* Pet. at 1; XR ECF No. 41-1. Petitioner has lived in Willits, California with his wife for over fifteen years. XR ECF No. 41-1 ¶ 3. However, Petitioner has been charged by Mexican authorities for the aggravated homicide of Omar Garcia ("Omar" or "Omar Garcia"), which allegedly took place in Guanajuato, Mexico on January 4, 2009.

Specifically, according to the complaint for Petitioner's provisional arrest, Petitioner was at a party in Santa Tomas Huatzindeo, a town in Guanajuato, on the night of January 4, 2009. XR ECF No. 1 ¶ 7. At some point that evening, Petitioner and Omar Garcia began fighting one another outside the party venue, and had to be separated. *Id.* Shortly thereafter, Omar was about to leave the party with Rodolfo Villegas Villafuerte ("Rodolfo") when Petitioner returned to the parking lot with his brother, Mauricio Ramirez Luna ("Mauricio"). *Id.* ¶ 8. Petitioner was holding a machete, and Mauricio was brandishing a firearm. *Id.* Then, while Rodolfo was driving his pickup truck out of the parking lot, Mauricio shot Rodolfo, and Rodolfo's truck subsequently traveled about twenty or thirty meters before hitting the main gate of the parking lot. *Id.* Omar approached the now-stopped pickup truck, but then began running back towards the interior of the parking lot. *Id.* ¶ 9. As Omar attempted to escape, Mauricio shot Omar several times, which caused Omar to fall to the ground face up. *Id.* The extradition complaint alleges that after this, Petitioner "stabbed Omar Garcia twice in the neck with a machete, killing him." *Id.*

Two eyewitnesses identified Petitioner as the man who fought with Omar Garcia and later struck him with a machete. *Id.* ¶¶ 9–10. As a result, Petitioner was charged with two counts of "Aggravated Homicide, as defined by Articles 138, 140, and 153 of the Penal Code of the State of Guanajuato," and a judge of the "Criminal Court in the State of Guanajuato" issued an arrest

---

[1] *In re Extradition of Luna*, No. 16-xr-90095 NC (N.D. Cal.), is Petitioner's underlying extradition proceeding. Hereinafter, the Court denotes docket entries and documents from Petitioner's underlying extradition proceeding with an "XR." For example, "XR ECF No. 1" refers to *In re Extradition of Luna*, No. 16-xr-90095 NC (N.D. Cal.), ECF No. 1, which is the first docket entry in Petitioner's underlying extradition proceeding.

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

warrant for Petitioner on May 8, 2009. *Id.* ¶ 5; XR Bates Stamp Number ("BSN") 55–85.

**B. Procedural History**

On February 8, 2016, the government filed a complaint for the provisional arrest of Petitioner with a view towards extradition. XR ECF No. 1. Petitioner was arrested and made an initial appearance before a Magistrate Judge on February 12, 2016. XR ECF No. 2. On April 7, 2016, the Magistrate Judge granted Petitioner's request for bail and found that Petitioner had established "special circumstances" for release. XR ECF No. 20.

On May 10, 2016, the government submitted formal extradition documents on behalf of Mexico and in support of extradition. XR ECF No. 27. Then, on September 29, 2016, Petitioner filed a motion to dismiss the extradition request. XR ECF No. 41. In that motion, Petitioner argued that his extradition was time-barred under Article 7 of the Mexico-United States Extradition Treaty of 1978. *Id.* The government opposed Petitioner's motion on October 11, 2016, XR ECF No. 42, and Petitioner filed a reply on October 19, 2016. XR ECF No. 43. On December 23, 2016, the Magistrate Judge denied Petitioner's motion to dismiss the extradition request. XR ECF No. 51.

Subsequently, on January 30, 2017, Petitioner filed a motion to deny the extradition due to lack of probable cause. XR ECF No. 52. The government filed an opposition on February 13, 2017. XR ECF No. 53. Then, on March 17, 2017, the Magistrate Judge denied Petitioner's motion to deny the extradition and certified Petitioner's extradition. XR ECF No. 56.

On March 22, 2017, Petitioner filed an unopposed motion to stay the certification of his extradition pending the filing of a habeas petition. XR ECF No. 59. The Magistrate Judge granted Petitioner's unopposed motion to stay on the same day. XR ECF No. 60. Then, on March 23, 2017, the government moved for reconsideration of the Magistrate Judge's April 7, 2016 order granting Petitioner's release on bail. XR ECF No. 61. Petitioner opposed the government's motion for reconsideration on March 29, 2017. XR ECF No. 62. On March 30, 2017, the Magistrate Judge denied the government's motion for reconsideration of bail. XR ECF No. 64.

On April 11, 2017, Petitioner filed a motion to reopen the evidence and reconsider the

certification of Petitioner's extradition. XR ECF No. 65. Petitioner's motion was based on two death certificates issued for Omar Garcia; Petitioner argued that the Magistrate Judge "could have reached a different decision had [he] been given the opportunity to consider" the death certificates because the certificates indicate that "bullet wounds were the sole cause of" Omar's death. *Id.* at 1–2. On April 13, 2017, the Magistrate Judge denied the motion. XR ECF No. 67.

Petitioner filed the instant petition for writ of habeas corpus on April 17, 2017. *See* Pet. On May 9, 2017, the government filed an opposition to Petitioner's petition. *See* Opp. Then, on May 12, 2017, the parties filed a Joint Motion Requesting Reassignment of Case to District Court Judge. ECF No. 6. As a result, on May 16, 2017, this case was assigned to the undersigned judge. ECF No. 8.

## II.     LEGAL STANDARD

A district court or Magistrate Judge's "decision to certify a person as extraditable is not subject to direct appeal but may be challenged collaterally through habeas corpus review" pursuant to 28 U.S.C. § 2241. *Prasoprat v. Benov*, 421 F.3d 1009, 1013 (9th Cir. 2005). In an international extradition, the district court's habeas review of an extradition order is limited to: (1) whether the extradition court had jurisdiction to conduct the proceedings as well as personal jurisdiction over the individual sought; (2) whether the extradition treaty was in force and whether the crime is an extraditable offense under the relevant treaty's terms; (3) whether there was probable cause that the individual committed the crime; and (4) whether the crime fell within the political offense exception. *Id.* The extradition court's conclusions of law are reviewed de novo, while its factual findings are reviewed for clear error. *Vo v. Benov*, 447 F.3d 1235, 1240 (9th Cir. 2006). Further, because the extradition court's "probable cause determination serves only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based," the extradition court's finding "must be upheld if there is any competent evidence in the record to support it." *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (citations and internal quotations omitted).

## III.     DISCUSSION

As discussed above, Petitioner argues in his petition that the Magistrate Judge's decision to certify Petitioner's extradition was erroneous because (1) Petitioner's extradition "is time-barred under the applicable treaty"; and (2) "the government failed to satisfy its burden of establishing probable cause to believe that [Petitioner] committed the offense for which extradition is sought." Pet. at 1. The Court addresses each of Petitioner's arguments in turn.

## A. Time Bar

Article 7 of the extradition treaty between the United States and Mexico states that "[e]xtradition shall not be granted when the prosecution or the enforcement of the penalty for the offense for which extradition has been sought has become barred by lapse of time according to the laws of the requesting or requested party." Extradition Treaty Between the United States of America and the United Mexican States, May 4, 1978, 31 U.S.T. 5059, art. 7 ("Treaty Article 7"). In his motion to dismiss the request for his extradition, Petitioner raised two arguments for why his extradition is barred "by lapse of time according to the laws of the . . . requested party," the United States. *Id.*; *see* XR ECF No. 41. First, Petitioner argued that "the applicable United States statute of limitations has run."[2] *Id.* at 4. Second, Petitioner argued that Article 7 of the extradition treaty incorporates the Speedy Trial Clause of the Sixth Amendment, and the Speedy Trial Clause "bars extradition in this case." *Id.* at 8–14. In denying Petitioner's motion to dismiss the extradition, the Magistrate Judge rejected both of these arguments. XR ECF No. 51. However, in the instant petition, Petitioner raises the same two time bar arguments and asserts that the Magistrate Judge erroneously rejected them. Pet. at 6–14. The Court considers each of Petitioner's time bar arguments in turn.

### 1. Statute of Limitations

The Ninth Circuit has recognized that Article 7 of the extradition treaty between the United States and Mexico "'preclude[s] extradition of a person whose prosecution in the United States

United States District Court
Northern District of California

---

[2] In his motion to dismiss the request for his extradition, Petitioner conceded that the 30-year Mexican statute of limitations had not run. XR ECF No. 41 at 4 n.5. Petitioner does not argue otherwise in the instant petition.

5

would offend our national statutes of limitations if he had committed his criminal conduct here.'"

*Sainez v. Venables*, 588 F.3d 713, 716 (9th Cir. 2009) (quoting *Clarey v. Gregg*, 138 F.3d 764, 767 (9th Cir. 1998). Further, the Ninth Circuit has stated that "[i]n determining what United States statute of limitations is applicable," courts must "look[] to the substantive offense under United States law which is most closely analogous to the charged offense, and applies the statute of limitations applicable to that offense." *Id.* at 716 (citation omitted).

In the instant case, Petitioner states that he has been charged with two counts of "aggravated homicide" "under Article 138 and Article 153(I) of the Guanajuato Criminal Code." Pet. at 7. The Magistrate Judge found that the federal crime that is most analogous to the offenses charged against Petitioner is second-degree murder, which has a statute of limitations of five years. XR ECF No. 51 at 4 (citing 18 U.S.C. §§ 1111(a)–(b), 3282). Petitioner agrees with this finding, Pet. at 7, but argues that his five-year statute of limitations has already run because no indictment or information was ever issued against Petitioner, and Mexico did not request Petitioner's extradition within the five-year limitations period. *Id.* at 8–9. For its part, the government argues that "regardless of whether the five-year period or a longer period applies" in the instant case, the issuance of an arrest warrant for Petitioner by a Mexican court on May 8, 2009—less than five months after the alleged offense occurred on January 4, 2009—"tolled the U.S. statute of limitations for purposes of Article 7." Opp. at 4.

Under binding Ninth Circuit law, the government is correct. The Ninth Circuit held in *Sainez* that "for the purpose of a civil proceeding such as an extradition, a Mexican arrest warrant is the equivalent of a United States indictment and may toll the United States statute of limitations." 588 F.3d at 717. Thus, even assuming Petitioner is correct that the applicable limitations period is five years, the issuance of a Mexican arrest warrant less than five months after Petitioner's alleged offense tolled the statute of limitations. As a result, Petitioner's extradition is not "preclude[d]" by any statute of limitations under United States law. *Clarey*, 138 F.3d at 767.

Petitioner acknowledges that this Court is bound by *Sainez*'s holding that a Mexican arrest

warrant "may toll [a] United States statute of limitations" for purposes of an extradition, 588 F.3d at 717, but "respectfully submits that *Sainez* was wrongly decided." Pet. at 8. This Court must apply *Sainez*'s holding unless and until it is overturned or abrogated by the Ninth Circuit or the United States Supreme Court. Thus, Petitioner's statute of limitations argument is unavailing, and the Magistrate Judge did not err by rejecting it.

### 2. Speedy Trial Clause

Petitioner's second time bar argument is that his extradition is barred "by lapse of time according to the laws of the" United States, Treaty Article 7, because the United States would bar the prosecution of Petitioner on the ground that his Sixth Amendment right to a speedy trial would have been violated. Petitioner's second time bar argument proceeds in two parts. First, Petitioner asserts that the "lapse of time" provision in Article 7 of the Mexico-United States extradition treaty incorporates the Sixth Amendment. Pet. at 9–11. Second, Petitioner argues that the Speedy Trial Clause of the Sixth Amendment would bar the prosecution of Petitioner in the instant case. *Id.* at 11–14.

In response, the government argues that, as numerous courts in this district and within the Ninth Circuit have held, the "lapse of time" provision in the extradition treaty between Mexico and the United States does not incorporate the Sixth Amendment's Speedy Trial Clause. Opp. at 7–8. Further, the government argues that "the extent, if any, to which a delay in filing an extradition request should factor into an extradition decision is a determination that should be left to the Secretary of State." *Id.* at 8.

The Court agrees with the government's argument that the "lapse of time" provision does not incorporate the Sixth Amendment's Speedy Trial Clause. Although Petitioner is correct that "[t]he Ninth Circuit has not addressed the question whether [the 'lapse of time' provision] incorporates the Sixth Amendment," Pet. at 10, several courts in this district, including this Court, have ruled against such incorporation. *See United States v. Cruz Garfias*, 2009 WL 2580641, *3 (N.D. Cal. Aug. 20, 2009); *In re Gonzalez*, 2011 WL 5190047, *2 (N.D. Cal. Oct. 31, 2011); *Gonzalez v. O'Keefe*, 2014 WL 6065880 (N.D. Cal. Nov. 20, 2014); *United States v. Matter of*

United States District Court
Northern District of California

*Extradition of Gonzalez*, 2015 WL 1409327 (N.D. Cal. Mar. 27, 2015).  As the Magistrate Judge observed in his order denying Petitioner's motion to dismiss the government's extradition request, "[m]ost of these opinions cite *Causbie Gullers v. Bejarano*, 293 F. App'x 488, 489 (9th Cir. 2008), an unpublished Ninth Circuit opinion, which discussed the treaty's 'lapse of time' provision as only implicating statutes of limitations."  XR ECF No. 51 at 5; *see also Clarey*, 138 F.3d at 766 ("The object of Article 7 of the Treaty is to preclude extradition of a person whose prosecution in the United States would offend our national statute of limitations if he had committed his criminal conduct here.").  Moreover, other courts within the Ninth Circuit have also found that Article 7's "lapse of time" provision does not incorporate the Sixth Amendment.  *See In re Silva-Peralta*, 2016 WL 4987483, *10 (S.D. Cal. Sep. 19, 2016); *In re Flores Ortiz*, 2011 WL 3441618, *5 (S.D. Cal. Feb. 9, 2011); *In re Extradition of Salazar*, 2010 WL 2925444, *6–7 (S.D. Cal. July 23, 2010).

Further, even though no Ninth Circuit case squarely addresses the issue of whether the "lapse of time" provision in the Mexico-United States extradition treaty incorporates the Sixth Amendment, the Court finds the reasoning against such incorporation in both *Kamrin v. United States*, 725 F.2d 1225 (9th Cir. 1984), and *In re Extradition of Kraiselburd*, 786 F.2d 1395 (9th Cir. 1986), persuasive.  In *Kamrin*, one of the treaty provisions at issue was Article X of the extradition treaty between Australia and the United States, which provided that "the person whose extradition is sought shall have the right to use such remedies and recourses as are provided by the law of the requested state."  725 F.2d at 1227 (alteration adopted).  Despite the text of this "remedies and recourses" provision, the Ninth Circuit rejected the petitioner's argument that the provision "entitle[d] him to the due process right that underlies United States statutes of limitations: the right to a trial in which his defense is unimpaired by the passage of time."  *Id.* at 1228.  In holding that the "remedies and recourses" provision in the Australia-United States extradition treaty did not incorporate due process protections that are afforded to defendants in American criminal proceedings, the Ninth Circuit relied on the long-settled rule "that United States due process rights cannot be extended extraterritorially."  *Id.*  Subsequently, in *Kraiselburd*,

the Ninth Circuit addressed a virtually identical "remedies and recourses" provision in the extradition treaty between Argentina and the United States, which granted fugitives "the right to use such remedies and recourses as are provided by the law of the requested Party." 786 F.2d at 1398. Relying in part on *Kamrin*, the Ninth Circuit rejected the petitioner's argument that the "remedies and recourses" provision in the Argentina-United States extradition treaty "imposes upon Argentina the duty to comply with the speedy trial and due process clauses of the United States Constitution." *Id.* Thus, contrary to Petitioner's argument that *Kamrin* and *Kraiselburd* provide "little guidance" to the resolution of the instant issue, Pet. at 11, the Court finds that the reasoning and conclusions in both *Kamrin* and *Kraiselburd* appear to be applicable here because both cases considered whether a treaty provision incorporated constitutional protections— including the Speedy Trial Clause—by allowing for the use of "such remedies and recourses as are provided by the law of the" United States.

Published decisions from other federal courts of appeal also support the Court's conclusion that the "lapse of time" provision in the Mexico-United States extradition treaty does not incorporate the Sixth Amendment. The Sixth Circuit, sitting en banc, recently came to the same conclusion about the same "lapse of time" provision in *Martinez v. United States*, 828 F.3d 451 (6th Cir. 2016). To reach its holding that Article 7's "lapse of time" provision does not incorporate the right to a speedy trial, the Sixth Circuit looked to, inter alia, the text of the provision and the history of extradition treaties. *See id.* at 457–62. As to the text of the provision, the Sixth Circuit observed that the speedy trial right is a "'relative,'" "'amorphous,'" and "'slippery'" one that "does not create a fixed time bar on trial initiation" but instead "'depends on circumstances.'" *Id.* at 457–58 (quoting *Barker v. Wingo*, 407 U.S. 514, 521–22 (1972)). Thus, "[l]apse of time, standing alone, does not—*cannot*—violate the Speedy Trial Clause in the absence of at least some . . . other factors." *Id.* at 458. The Sixth Circuit therefore concluded that "[b]ecause the Sixth Amendment does not establish a time limit, fixed or otherwise, before a trial must start, it does not create a rule that 'bar[s]' criminal prosecutions due to 'lapse of time'" within the meaning of Article 7 of the Mexico-United States extradition treaty. *Id.* at 457–58.

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Further, as to history, the Sixth Circuit relied upon "over a century of law equating 'lapse of time' [in other extradition treaties] with statutes of limitations," and not the Sixth Amendment. *Id.* at 462.

Similarly, the Eleventh Circuit held in *Yapp v. Reno*, 26 F.3d 1562 (11th Cir. 1994), that the "lapse of time" provision in an extradition treaty between the United States and the Bahamas referred only to statutes of limitations and did not incorporate the Sixth Amendment right to a speedy trial. *Id.* at 1567. To reach this conclusion, the Eleventh Circuit relied upon "the fact that for over a century, the term 'lapse of time' has been commonly associated with a statute of limitations violation." *Id.* Further, after noting that interpreting the treaty provision to incorporate the speedy trial right "would require a district judge or Magistrate Judge, generally unfamiliar with foreign judicial systems and the problems and circumstances facing them, to assess the reasonableness of a foreign government's action in an informational vacuum," the Eleventh Circuit expressed doubt that "the parties who negotiated" the treaty "would have intended" this consequence "without stating their intention to do so more explicitly." *Id.* at 1568.

The only opinions that Petitioner cites to support his position are the dissenting opinions from *Martinez* and *Yapp*. Pet. at 10–11. However, the Court adopts the interpretation of the "lapse of time" provision that is supported by the substantial weight of authority, as described above. As a result, the Court concludes that the "lapse of time" provision in Article 7 of the Mexico-United States extradition treaty does not incorporate the Speedy Trial Clause of the Sixth Amendment. Therefore, the Magistrate Judge correctly found that Petitioner's extradition was not barred by the Speedy Trial Clause.

## B. Probable Cause

In order to certify an extradition, an extradition court must find that there is probable cause to believe that the accused committed the charged offense. This means that an extradition court may certify an extradition only if there is "'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the accused's guilt.'" *In re Flores Ortiz*, 2011 WL 3441618, *7 (S.D. Cal. Feb. 9, 2011) (quoting *United States v. Wiebe*,

733 F.2d 549, 553 (8th Cir. 1984)).  Thus, the function of an extradition court is "to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."  *Collins v. Loisel*, 259 U.S. 309, 316 (1922) (internal citations and quotations omitted).  The ultimate determination of guilt or innocence "remains to be determined in the courts of the demanding country."  *Sainez*, 588 F.3d at 717.

When reviewing the extradition court's probable cause determination, the Court does not weigh the evidence presented to the extradition court—even when there are inconsistencies within the evidence.  *Sainez*, 588 F.3d at 718 ("Crotte invites us to weigh the witness' statements, arguing that their inconsistencies preclude a finding of probable cause.  However, weighing the evidence is not a function we perform when we review the magistrate's probable cause determination.").  Instead, on habeas review of an extradition order, this Court must uphold the extradition court's probable cause determination "if there is *any* competent evidence in the record to support it."  *Quinn*, 783 F.2d at 791 (emphasis added).

As discussed above, during his extradition proceedings in front of the Magistrate Judge, Petitioner filed a motion to deny the extradition due to lack of probable cause.  XR ECF No. 52.  In that motion, Petitioner conceded that there "is probable cause to believe that [Petitioner] cut Omar Garcia's neck with a machete on the night Mr. Garcia was killed."  *Id.* at 1.  However, Petitioner argued that the government had "failed to establish probable cause to believe that this injury is what caused [Omar] Garcia's death" because (1) Petitioner "is not alleged to have cut Mr. Garcia until *after* [Petitioner's] brother had shot [Omar] Garcia six times at close range," which "penetrated Mr. Garcia's thorax and abdomen"; and therefore (2) "it appears probable that Omar Garcia was already dead when [Petitioner] cut him."  *Id.*  Despite Petitioner's arguments, the Magistrate Judge found that there is "probable cause to believe that [Petitioner] committed the offense of aggravated homicide."  XR ECF No. 56 at 14.

In the instant habeas petition, Petitioner once again appears to concede that there is probable cause to believe that Petitioner cut Omar's neck with a machete by stating that "[t]he

11

only issue is whether [Omar] Garcia was already dead when [Petitioner] allegedly cut him with a machete." Pet. at 17. Nonetheless, Petitioner asserts that the Magistrate Judge erred in finding that there is probable cause to believe that Petitioner killed Omar. Petitioner's argument proceeds in two parts. First, Petitioner argues that the Magistrate Judge erred by excluding some of Petitioner's proffered evidence, specifically: (1) an expert report by Dr. Katherine Raven, a forensic pathologist; and (2) "the death certificates issued by the Guanajuato Department of the Civil Registry and Department of Health." Pet. at 16–20. Second, Petitioner argues that after taking into account the excluded pieces of evidence, the totality of the evidence "fails to establish probable cause" to believe that Petitioner killed Omar. *Id.* at 20–24.

For the reasons stated below, the Court concludes that the Magistrate Judge did not err in finding that there is probable cause to believe that Petitioner committed aggravated homicide. First, the Court explains the applicable legal standard for admissibility of evidence offered by the accused in an extradition proceeding. Second, the Court details the Magistrate Judge's probable cause determination and the underlying admissibility rulings. Third and finally, the Court addresses Petitioner's two-part argument.

### 1. Legal Standard for Admissibility of Evidence Offered by the Accused

"Given the limited nature of extradition proceedings, neither the Federal Rules of Evidence nor the Federal Rules of Criminal Procedure apply." *Santos v. Thomas*, 830 F.3d 987, 992 (9th Cir. 2016). Instead, under 18 U.S.C. § 3190, evidence is admissible so long as it is authenticated and would "be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped." However, it is well-established that "the accused . . . does not have the right to introduce evidence in defense because that would require the government seeking his extradition 'to go into a full trial on the merits in a foreign country.'" *Santos*, 830 F.3d at 992 (quoting *Collins*, 259 U.S. at 316). Thus, evidence that "merely controverts the existence of probable cause," *Mainero v. Gregg*, 164 F.3d 1199, 1207 n.7 (9th Cir. 1999), or "contradict[s] the testimony for the prosecution," *Collins*, 259 U.S. at 316 (quoting *Charlton v. Kelly*, 229 U.S. 447, 461 (1913), is inadmissible. *See also Barapind v. Enamoto*, 400 F.3d 744, 750 (9th Cir. 2005)

12

(stating that "extradition courts 'do not weigh conflicting evidence' in making their probable cause determinations") (alteration adopted) (quoting *Quinn*, 783 F.2d at 815). On the other hand, "evidence that 'explains matters referred to by the witnesses for the government'" is admissible. *Santos*, 830 F.3d at 992 (quoting *Charlton*, 229 U.S. at 461).

The Ninth Circuit has observed that "[t]he federal courts have struggled to distinguish between" "explanatory" evidence (which is admissible) and "contradictory" evidence (which is not). *Santos*, 830 F.3d at 992. However, the Ninth Circuit has "described 'contradictory' evidence as evidence 'the credibility of which could not be assessed without a trial.'" *Id.* at 993 (quoting *Barapind*, 400 F.3d at 749–50); *see also Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981) ("An accused in an extradition hearing has no right to contradict the demanding country's proof or to pose questions of credibility as in an ordinary trial, but only to offer evidence which explains or clarifies that proof."). "In practice, this means that an individual contesting extradition may not, for example, present alibi evidence, facts contradicting the government's proof, or evidence of defenses like insanity, as this tends to call into question the credibility of the government's offer of proof." *Santos*, 830 F.3d at 993. Nor can the accused "impeach government witnesses or produce witnesses whose testimony contradicts evidence already offered by the government." *Id.* However, "the accused may testify 'to things which might have explained ambiguities or doubtful elements' in the government's case." *Id.* (quoting *Collins*, 259 U.S. at 315–16).

## 2. The Magistrate Judge's Probable Cause Determination and Admissibility Rulings

### a. Evidentiary Basis of Probable Cause Determination

As discussed above, the Magistrate Judge rejected Petitioner's challenge to probable cause, which was premised on the argument that "it appears probable that Omar Garcia was already dead when [Petitioner] cut him." XR ECF No. 52 at 1. The Magistrate Judge based his probable cause finding on statements from four witnesses and Omar Garcia's's autopsy report. XR ECF No. 56 at 8–10. The first witness, Pablo Murillo Ramirez ("Pablo"), gave one witness statement on January 5, 2009, the day after Petitioner allegedly committed aggravated homicide, and another witness

13

statement on October 8, 2012. In his 2009 statement, Pablo recounts that shortly after Petitioner and Omar fought in the parking lot of the party venue and were separated, Pablo heard gunshots, noticed a black Ford pickup truck, and saw Petitioner's brother, Mauricio, walk alongside the truck with a black pistol. XR ECF No. 52-3 at MX000032. Pablo further states that he saw Omar go into the parking lot and "fall sideways to the ground," and that immediately afterwards, Pablo saw Mauricio fire shots toward the ground "in the direction where Omar was lying." *Id.* at MX000033. Next, Pablo saw the black truck drive by "approximately 20 meters" away, and then observed Mauricio "holding the gun, and [Petitioner] with a machete in his right hand; both of them were walking out of the parking lot where Omar was lying." *Id.* In his 2012 statement, Pablo states that immediately after seeing Omar fall in the parking, he saw Mauricio approach Omar and fire "several times at [Omar] on the neck." XR BSN 188. Subsequently, Pablo saw Petitioner approach Omar "carrying a big machete" and then "stab[] Omar with it several times, being one in the head and another one in the neck forming a cross." *Id.*

The second witness, Luis Angel Garcia Sanchez ("Luis"), also gave two witness statements—one on January 5, 2009 and another on October 8, 2012. In his 2009 statement, Luis recounts that after exiting the party venue to observe the fight between Petitioner and Omar, and after the two fighters were separated, Luis saw Petitioner "with a machete in his right hand" outside of Petitioner's house, which was nearby. XR ECF No. 52-2 at MX000050. Luis states that he then saw Mauricio walk out of Petitioner's house with a gun in his right hand towards the party venue. *Id.* at MX00051. Next, just as a man named Rodolfo Villegas Villafuerte ("Rodolfo") was "exiting the parking lot in a black Ford truck" and "going to start driving forward," Mauricio "walked up to the left side door of the truck and fired 3 to 4 shots in Rodolfo's direction," which caused the truck to continue "moving on its own 20 or 30 meters toward the other entrance to the parking lot, scraping its right side as it went until it stopped in front of a white gate through which one can also access said parking lot." *Id.* Luis says that he then "noticed Omar standing by that gate" while Mauricio approached Omar with a gun, and explains that "upon seeing [Mauricio] approaching," Omar ran first toward the truck and then into the

parking lot, but "fell to the ground after managing to run a distance of barely 1 meter." *Id.* Luis further states that he saw Mauricio fire his gun at Omar from behind five times, that Omar fell down and somehow "ended up positioned face up," and that Mauricio subsequently fired 3 more shots at Omar's chest "with Omar already lying on the ground, screaming to [Mauricio], 'Drop the piece, mother fucker.'" *Id.* Then, Luis saw Petitioner come up to Omar with the machete and hit Omar "somewhere around the right side of the neck, while Omar was lying on the ground." *Id.* Finally, Luis affirms that "Omar was still alive when [Petitioner] hit him with the machete" because Luis "could see [Omar] was groaning, and [Omar] began bleeding profusely," and he also notes that he observed all of this happen from "about 7 meters away" with the help of "plenty of light from several lampposts." *Id.*

In his 2012 statement, Luis states that he was already outside when he saw Petitioner and Omar begin fighting and later be broken up. XR BSN 183. Luis also says that he spoke with Omar shortly after the fight and urged Omar to leave the party with Rodolfo, and that soon thereafter, he observed "a lot of persons on the street running and yelling" and heard people saying 'here they come! And they have something.'" *Id.* Then, Luis recounts that he saw Mauricio shoot Omar and Petitioner strike Omar in the neck with a machete. *Id.* Luis further states that after Mauricio and Petitioner walked away from the scene, Luis approached Omar and "could see that he was dying, since he was really fucked up." *Id.*

The third witness, Miguel Angel Yerena Vera ("Miguel"), provided one witness statement on January 5, 2009. In that statement, Miguel states that he saw Petitioner and Omar fighting from inside the party venue, and that shortly thereafter, he observed a "black pickup truck" driven by Rodolfo that "was exiting the parking lot in reverse." XR ECF No. 52-9 at MX000035. Miguel then saw Mauricio approach the truck from the driver's side holding a gun, reach in through the truck's left window, and shoot Rodolfo "almost point-blank." *Id.* at MX000036. While the truck continued to move "for another 20 meters" before stopping, Miguel noticed Omar running into the parking lot and then heard "3 to 5 more shots." *Id.* Miguel further recounts that shortly after hearing the gun shots, he saw Mauricio and Petitioner running out of the parking lot,

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

with Petitioner holding a machete. *Id.* Miguel then walked to the truck to see Rodolfo and thought that Rodolfo was "already dead because he wasn't moving, and had lots of blood around the chest and neck area." *Id.* Next, Miguel recalls that he "went to the parking lot to check what had happened to Omar," "saw [Omar] lying face up," and saw that Omar "was still alive, but had a big wound in his neck, and was bleeding a lot." *Id.* Then, "[u]pon noticing [Omar] was still alive," Miguel and some other bystanders "proceeded to pick [Omar] up and move him closer to the pickup" in order "to take him in the truck to seek medical attention." *Id.*

The fourth witness, Victor Alfonso Hernandez Ramirez ("Victor"), provided a witness statement on March 10, 2009. Victor's statement indicates that Victor did not see the initial fight between Omar and Petitioner, but that he did see Mauricio shoot both Rodolfo (while Rodolfo was driving a black truck) and Omar. XR ECF No. 52-5 at MX000204–05. In his statement, Victor recounts that after Mauricio shot Omar several items in the back and chest, Victor saw Petitioner "walk[] up holding a machete in his right hand" to Omar. *Id.* at MX00205. Then, Victor says that "while Omar lay on the ground, still alive because he was groaning a lot, [Petitioner] hit him with [the machete] somewhere along the right side of the neck." *Id.* Also in his statement, Victor notes that he "saw all this from a distance of about 4 meters" while he "was standing at the entrance to the parking lot," and that he "could see everything well because there are a lot of lamps inside and outside the parking lot." *Id.*

As to the autopsy results, Omar Garcia's autopsy was completed on January 5, 2009 by Diana Cuevas Saldana and Ubaldo De Jesus Aguilar Aguilera. XR BSN 111. The autopsy report identified eight firearm wounds, one wound "with characteristics of those produced by a sharp weapon, lineal form, found in chin and right parotid-mastoidal areas," and wounds to Omar Garcia's hands caused by a knife. XR BSN 113–14. The autopsy classified as lethal "EITHER SEPARATELY OR IN CONJUNCTION" (1) injuries caused by a sharp weapon penetrating Omar Garcia's neck; and (2) injuries caused by firearm projectiles penetrating his thorax and abdomen. XR BSN 117. Finally, the autopsy report found that Omar Garcia's "immediate" cause of death was: "WOUND PRODUCED BY SHARP-EDGED INSTRUMENT AND WOUNDS

16

OF PROJECTILES FIRED FROM A GUN WHICH PENETRATED THORAX AND ABDOMEN AND DOUBLE PENETRATION IN THORAX AND ABDOMEN." XR BSN 118 (caps in original).

The Magistrate Judge found that this evidence was sufficient to support probable cause to believe that Omar Garcia was still alive when Petitioner struck him in the neck with a machete, and thus that Petitioner's machete strike was a cause of Omar's death. Although Petitioner argued that the 2012 witness statements from Luis and Pablo were unreliable because those statements were inconsistent with their 2009 statements, XR ECF No. 52 at 10–12, the Magistrate Judge concluded that "[t]hough there are some inconsistencies in the testimonies of Pablo Murillo Ramirez and Luis Angel Garcia Sanchez, those inconsistencies are not so great, and they do not bear on the key contested facts: that [Petitioner] struck Omar with the machete, and that Omar was still alive when this happened." XR ECF No. 56 at 9. Further, the Magistrate Judge pointed out that "[e]ven if the Court were to accept the challenges to Pablo and Luis' testimonies, which it does not, that still leaves the eyewitness testimony of Miguel [] and Victor [] unchallenged." *Id.* Because Victor saw that Omar Garcia was still alive when Petitioner struck Omar with the machete, and because Miguel saw that Omar was still alive *after* being shot and struck with the machete, the Magistrate Judge concluded that "[t]hese two eyewitness statements" from Miguel and Victor "would support a probable cause finding in this case" on their own. *Id.* at 9–10.

### b. Admissibility Rulings

Petitioner offered an expert report by Dr. Katherine Raven, a forensic pathologist, in support of his motion to deny extradition for lack of probable cause. XR ECF No. 52 at 11–12; XR ECF No. 52-7 ("Raven Report"). To construct her report, Dr. Raven relied on the exhibits submitted in support of the extradition, and did not personally examine Omar Garcia's body. Raven Report at 1. In her report, Dr. Raven states that she could not determine "[f]rom the autopsy alone" whether Petitioner's machete strike to Omar Garcia's neck "truly contributed to Mr. Garcia's death." *Id.* at 2. Dr. Raven further notes that "[i]ncluding all significant injuries in a cause of death [autopsy report] is not an uncommon practice in cases where there are multiple

modalities of injury," and reasoned that although independent fatal wounds "are grouped together collectively for purposes of a cause of death statement," "it should not be inferred from such a statement which injury was specifically fatal." *Id.* Dr. Raven's report then provides reasons why the machete wounds were not the cause of Omar Garcia's death. Specifically, Dr. Raven states that if Omar had "been alive when he sustained the machete wound to the neck," there likely would have been "significant blood at the scene, and likely an arterial spurting pattern from the injury to the right carotid artery," such that witnesses would likely have "described vigorous blood loss and even spurting from the neck." *Id.* However, Dr. Raven notes that none of the photographs or witness statements documented any "arterial spurting," and that the autopsy "did not report any soft tissue hemorrhages in the neck associated with the sharp force injury which would certainly have been expected had Mr. Garcia been alive at the time the [machete] injury was sustained." *Id.* Beyond that, Dr. Raven's report states that some of the "movement," "twitching," and "noises and deep sounds coming from the back of the throat" that witnesses might have observed from Omar Garcia's body before Petitioner struck Omar "can occur for various reasons in the early postmortem period and should not be considered proof of life." *Id.* Thus, Dr. Raven concludes in her report that "the cause of [Omar Garcia's] death can appropriately [be] certified as a consequence of multiple gunshot wounds." *Id.*

However, the Magistrate Judge ruled that Dr. Raven's report was inadmissible in Petitioner's extradition proceedings. In excluding Dr. Raven's report, the Magistrate Judge highlighted the fact that "the Mexican autopsy for Omar Garcia stated that his immediate cause of death was both the machete and gun wounds." XR ECF No. 56 at 11. The Magistrate Judge then explained that under the legal standard governing admissibility of evidence in extradition proceedings, Petitioner could not present evidence contradicting the Mexican autopsy's findings on Omar Garcia's cause of death. *Id.* (citing *Mainero*, 164 F.3d at 1207 n.7). Further, the Magistrate Judge found that because Dr. Raven stated in her report that she "was asked to specifically review the autopsy protocol and photographs pertaining to Mr. Omar Garcia to see if Mr. Garcia was still alive at the time the machete wound was inflicted," *id.* (quoting Raven Report

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

at 2), "the reason [Dr. Raven] was retained as an expert" was not "merely . . . to explain away some of the government's evidence," but rather "to negate the specific finding of" Omar's cause of death, according to the autopsy report. *Id.* In sum, because Dr. Raven's report contradicted the cause of death finding in Omar Garcia's autopsy, the Magistrate Judge found that the report was inadmissible. *Id.*

The Magistrate Judge then concluded that "[e]ven if the Raven Report were considered in these extradition proceedings, it would not negate probable cause." *Id.* Specifically, the Magistrate Judge pointed out that while Dr. Raven's report concludes that Omar Garcia's cause of death "can be appropriately certified" as being caused by the gunshots, it also states that Dr. Raven "cannot determine if the sharp force injury truly contributed to" Omar's death. *Id.*; Raven Report at 2. The Magistrate Judge emphasized that there is "no certainty to these findings." XR ECF No. 56 at 11. Beyond that, the Magistrate Judge also highlighted Dr. Raven's observations that "'[p]hotographs of the scene and autopsy were of poor quality and minimal'" and that no "'close-up photographs of blood depositions at the scene were provided.'" *Id.* (quoting Raven Report at 2). The Magistrate Judge stated that the lack of certainty in Dr. Raven's findings, combined with the acknowledged deficiencies in the photographic evidence upon which Dr. Raven relied, "undermine[d] [Dr. Raven's] conclusion that the gunshot wounds, and not the machete wounds, or a combination thereof, caused Omar's death." *Id.* at 12. Finally, and more generally, the Magistrate Judge explained that "evidence presented to the court in support of extradition may be contradictory," *id.* (citing *Sainez*, 588 F.3d at 718), so long as "there is enough evidence to 'conscientiously entertain' the reasonable belief that [Petitioner] committed the crime." *Id.* (quoting *In re Flores Ortiz*, 2011 WL 3441618, at *7). In light of this standard, the Magistrate Judge concluded that, even considering Dr. Raven's report, "the combination of the witness statements and the autopsy, which was performed on the body the day after Omar's death, support a finding of probable cause that [Petitioner] committed the murder of Omar Garcia." *Id.*

Shortly after the Magistrate Judge found probable cause and certified Petitioner's extradition, Petitioner filed a motion to reopen the evidence and reconsider the certification of

extradition.  XR ECF No. 65.  In that motion, Petitioner asked the Magistrate Judge to consider two additional documents: (1) a certified death certificate for Omar Garcia issued by the Guanajuato Department of the Civil Registry; and (2) "a form entitled Department of Health Death Certificate with regard to the death of Omar Garcia."  *Id.* at 2–4.  The former document states that Omar Garcia's death was caused by "wounds produced by projectiles discharged from a firearm, penetrating wound to face and neck, abdomen, and thorax-abdomen double-penetrating wound." XR ECF No. 66-1 at 4.  The latter document states that Omar's "death resulted from the impact of a projectile discharged from a firearm" and, in another section, identifies Omar's "cause/s of death" as "[w]ounds produced by a projectile" that was "[d[ischarged by a firearm penetrating" "[of] face [] abdomen and" "thoracic-abdominal."  XR ECF No. 66-2 at 3.  Petitioner asserted that these documents indicate "that the bullet wounds were the sole cause" of Omar Garcia's death, and argued that the documents should be admitted into evidence because they amounted to "'evidence that explains away or completely obliterates probable cause.'"  XR ECF No. 65 at 2 (quoting *Mainero*, 164 F.3d at 1207 n.7).

The Magistrate Judge disagreed with Petitioner's argument and denied his motion to reopen the evidence.  XR ECF No. 67.  Specifically, the Magistrate Judge observed that because the government offered Omar Garcia's autopsy—which listed the knife wound as a cause of Omar's death—to support probable cause, and because Petitioner's offer of Omar's death certificates amounted to an assertion that "the Court should prefer the stated cause of death on the death certificate rather than the discussion in the autopsy," the death certificates constituted "evidence contradicting the government's offer of proof."  *Id.* at 2.  As a result, the Magistrate Judge concluded that the death certificates were inadmissible "contradictory" evidence, and therefore found "no grounds to reopen the evidence . . . and disturb [the] March 17, 2017 certificate of extradition."  *Id.*

### 3.  Petitioner's Two-Part Argument

As discussed above, in the instant habeas petition, Petitioner concedes that "[t]he only issue is whether [Omar] Garcia was already dead when [Petitioner] allegedly cut him with a

20

machete," Pet. at 17, but nonetheless asserts a two-part argument for why the Magistrate Judge erred in finding that there is probable cause to believe that Petitioner killed Omar. Petitioner's argument proceeds as follows: (1) the Magistrate Judge erred by excluding Dr. Raven's report and the death certificates issued by the Guanajuato Department of the Civil Registry and Department of Health; and (2) after taking these excluded pieces of evidence into account, the totality of the evidence "fails to establish probable cause" to believe that Petitioner killed Omar Garcia. *Id.* at 16–24. The Court addresses each part of Petitioner's argument in turn.

### a. Admissibility of Evidence

As an initial matter, Petitioner asserts that the Magistrate Judge erred by failing to allow Dr. Raven's report and the death certificates into evidence. First, as to Dr. Raven's report, Petitioner argues that contrary to the Magistrate Judge's conclusion, "Dr. Raven did not challenge the autopsy report or its finding[]" that the machete wound was a cause of Omar Garcia's death, and her "description of how a body behaves after death was not meant to counter the testimony of witnesses who saw bleeding and heard groaning." Pet. at 19. Instead, according to Petitioner, Dr. Raven's report seeks only to explain "that [autopsy] reports frequently list all injuries that could have independently caused the death, even though not all of those injuries actually did cause the death," and to "provide context to enable the court in evaluating the credibility of the witnesses' claims." *Id.*

Petitioner's argument regarding the admissibility of Dr. Raven's report is not well-taken. As the Magistrate Judge explained, the autopsy report expressly states that an "immediate" cause of Omar's death was a "'WOUND PRODUCED BY SHARP-EDGED INSTRUMENT.'" XR ECF No. 56 at 10 (quoting XR BSN 118 (caps in original)). Dr. Raven's report does more than attempt to "explain away" this finding in the autopsy report. Rather, Dr. Raven's report provides reasons for why Omar was already dead before the machete strike and affirmatively concludes that Omar's "cause of death can appropriately [be] certified as a consequence of multiple gunshot wounds." Raven Report at 2. Therefore, the central finding of Dr. Raven's report squarely contradicts the autopsy report's cause of death finding. Further, although Petitioner insists that Dr.

Raven's description of "how a body behaves after death" was meant only to "provide context" for "evaluating the credibility of the witnesses' claims," the Ninth Circuit has stated that evidence that "tends to call into question the credibility of the government's offer of proof" may not be introduced by "an individual contesting extradition." *Santos*, 830 F.3d at 993. Thus, evaluating Dr. Raven's report as a whole, and keeping in mind Dr. Raven's statement that she was "asked [by Petitioner] to specifically review [the evidence] to see if [Omar] Garcia was still alive at the time the machete wound was inflicted," the Court agrees with the Magistrate Judge that Dr. Raven's report amounts to inadmissible "contradictory" evidence.

Second, as to the death certificates, Petitioner argues that "the purpose of the death certificates is not to contradict the government's offer of proof, but rather to explain 'ambiguities and doubtful elements in the government's case.'" Pet. at 20 (quoting *Santos*, 830 F.3d at 993 (internal quotation marks omitted)). Petitioner's argument is unavailing. As explained above, unlike the autopsy report, the death certificates list the gunshot wounds, but not the machete wound, as the cause of Omar Garcia's death. Thus, the Court agrees with the Magistrate Judge that Petitioner's proffering of the death certificates amounts to an argument that "the Court should prefer the stated cause of death on the death certificate[s] rather than the discussion in the autopsy." XR ECF No. 67 at 2. In other words, the death certificates directly "contradict[] the government's proof." *Santos*, 830 F.3d at 993. As a result, the Magistrate Judge did not err by excluding the death certificates from Petitioner's extradition proceedings.

### b. Probable Cause Under the Totality of the Evidence

Contrary to the second part of Petitioner's argument, even if it were proper to consider Dr. Raven's report and the death certificates, the Court finds that there would still be sufficient evidence to support probable cause to believe that Petitioner committed aggravated homicide. As explained above, probable cause means "'evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the accused's guilt.'" *In re Flores Ortiz*, 2011 WL 3441618 at *7 (quoting *Wiebe*, 733 F.2d at 553). Moreover, an extradition court's probable cause finding must be upheld "if there is *any* competent evidence in

22

United States District Court
Northern District of California

the record to support it." *Quinn*, 783 F.2d at 791 (emphasis added).

As the Magistrate Judge explained, probable cause is supported in the instant case by an autopsy report and witness statements from four eyewitnesses. *See* XR ECF No. 56 at 7–10. The autopsy report concludes that a "WOUND PRODUCED BY SHARP-EDGED INSTRUMENT" was a cause of Omar Garcia's death. XR BSN 118 (caps in original). Additionally, two of the witnesses—Luis and Victor—expressly state that Omar was still alive immediately before Petitioner struck Omar with the machete, XR ECF No. 52-2 at MX000051; XR ECF No. 52-5 at MX00205, while one of the witnesses—Miguel—states that Omar was still alive *after* the machete strike. XR ECF No. 52-9 at MX000036. Indeed, in his statement, Miguel recounts that (1) in contrast to Rodolfo, who appeared to be dead, Omar appeared to Miguel and other bystanders to be alive even after Mauricio and Petitioner departed from the parking lot; and (2) because Omar appeared to be alive, Miguel and the other bystanders "proceeded to pick [Omar] up and move him closer to the pickup" in order "to take him in the truck to seek medical attention." *Id.*

Further, although there are some minor inconsistencies between the statements that two of the witnesses—Pablo and Luis—gave in 2009 and the statements they gave in 2012, the Magistrate Judge correctly found that (1) none of those inconsistencies "bear on the key contested fact[]" of whether "Omar was still alive when" Petitioner allegedly struck Omar with the machete; and (2) even setting aside Pablo and Luis's statements as unreliable, the eyewitness accounts from Miguel and Victor are sufficient to support probable cause to believe that Omar Garcia was still alive immediately before sustaining the knife wound. XR ECF No. 56 at 9. Moreover, even taking into consideration Dr. Raven's cautionary statements that any "movement," "twitching," and "noises and deep sounds coming from the back of the throat" that witnesses might have observed from Omar Garcia's body "should not be considered proof of life," Raven Report at 2, Miguel cited none of these characteristics as reasons for why Omar appeared to be alive when recounting how he and several other bystanders moved Omar "to take him in the truck to seek medical attention." XR ECF No. 52-9 at MX000036.

More generally, with regards to Dr. Raven's report as a whole, the Court agrees with the

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

1   Magistrate Judge that there is "no certainty to" Dr. Raven's findings, XR ECF No. 56 at 11, as Dr.

2   Raven expressly states that she "cannot determine if the sharp force injury truly contributed to"

3   Omar's death. Raven Report at 2. The Court also agrees that this lack of certainty, when

4   combined with Dr. Raven's own observations about the "poor quality" and "minimal"

5   photographic evidence from the crime scene and the absence of "close-up photographs of blood

6   depositions at the scene," at least partially undermines Dr. Raven's "conclusion that the gunshot

7   wounds, and not the machete wounds, or a combination thereof, caused Omar's death." XR ECF

8   No. 56 at 12 (quoting Raven Report at 2).

9        As a result, even taking into consideration the evidence that the Magistrate Judge excluded,

10   the Court finds that the witness statements and the autopsy report provide sufficient evidence "to

11   cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief"

12   that Petitioner committed aggravated homicide. *In re Flores Ortiz*, 2011 WL 3441618 at \*7

13   (quoting *Wiebe*, 733 F.2d at 553). Again, the Court must uphold the Magistrate Judge's probable

14   cause determination so long as there is "*any* competent evidence in the record" to support it.

15   *Quinn*, 784 F.2d at 791 (emphasis added). In other words, "weighing the evidence is not a

16   function we perform when we review the magistrate's probable cause determination." *Sainez*, 588

17   F.3d at 718. In the instant case, the Court concludes that even in the face of contradictory

18   evidence presented by Dr. Raven's report and the death certificates, the autopsy report and the

19   witness statements—and especially Miguel's statement—are sufficient to cross the "any

20   competent evidence" threshold and to justify a reasonable belief that Omar Garcia was still alive

21   when Petitioner allegedly struck him in the neck with a machete. Accordingly, the Magistrate

22   Judge did not err by finding that there is probable cause to believe that Petitioner committed

23   aggravated homicide.[3]

24

25   [3] Petitioner also points to an article entitled *Mexico's Deathly Data*, Stanford Magazine 28
(Nov./Dec. 2016). Mot. at 20 n.10 (citing XR ECF No. 52-8). That article discusses, inter alia,
26   how well-funded criminal organizations in Mexico frequently "buy off local officials as well as
municipal, state and federal police officers." XR ECF No. 52-8. Based on this article, Petitioner
27   urges the Court to "apply particular scrutiny to all of the statements obtained by the Mexican
authorities in light of the widespread corruption of law enforcement." *Id.* However, the Court

28
Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is DENIED.

**IT IS SO ORDERED.**

Dated: February 8, 2018

*Lucy H. Koh*

LUCY H. KOH
United States District Judge

---

agrees with the Magistrate Judge's determinations that (1) Petitioner's request to "distrust all evidence obtained from the Mexican government" based on one magazine article is a "sweeping request" that "is poorly supported"; and (2) "the article is irrelevant" in the instant case "because no one alleges a criminal organization was in any way involved in Omar's murder."  XR ECF No. 56 at 10 n.2.  As a result, the Court finds that the Stanford Magazine article falls well short of defeating probable cause in the instant case.

25

Case No. 17-CV-02129-LHK
ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS